# In the United States Court of Federal Claims

No. 20-1539C

(Filed:  March 26, 2021)

|  |  |
|---|---|
| NAVAL SYSTEMS, INC., | ) |
| *Plaintiff,* | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| *Defendant.* | ) |

*John R. Tolle*, Baker, Cronogue, Tolle & Werfel, LLP, McLean, VA, for Plaintiff.

*Russell J. Upton*, Trial Attorney, Commercial Litigation Branch, United States Department of Justice, Washington, DC, for Defendant.  With him on the briefs were *Elizabeth M. Hosford*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, Commercial Litigation Branch, and *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, United States Department of Justice.  Of counsel on the briefs was *Christopher Erly*, Office of the General Counsel, United States Department of the Navy, Patuxent River, MD.

## ORDER AND OPINION

*SOLOMSON*, **Judge.**

This matter presents a different twist on the "late is late" line of cases regarding proposal timeliness,[1]  although perhaps a more accurate characterization of the issue

---

[1] The "late is late" rule prohibits an agency from accepting a proposal, proposal modifications, or revisions after the deadline for proposals established by the agency in a solicitation. *Progressive Indus., Inc. v. United States*, 129 Fed. Cl. 457, 475–76 (2016) (citing FAR 52.212–1(f)); *see also* FAR 52.215–1(c)(3)(i).  As the Federal Circuit explained, "[t]here are inherent competitive advantages to submitting a proposal after all other parties are required to do so," including the ability to make "last minute changes to the proposal." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009); *see also Criterion Sys., Inc. v. United States*, 144 Fed. Cl. 409 (2019) (agency did not act arbitrarily or capriciously by rejecting bidder's proposal that was filed ninety seconds after deadline); *Johnson Controls Government Sys., LLC v. United States*, 125 Fed.

here is whether the proverbial teacher – as opposed to the dog – ate the plaintiff's homework. Specifically, Plaintiff, Naval Systems, Inc. ("NSI"), alleges that, on October 19, 2020, NSI submitted a timely proposal in response to Solicitation No N00421-20-R-0003 ("the Solicitation"), but that Defendant, the United States – acting by and through the Department of the Navy ("the Agency") – somehow lost NSI's proposal in the electronic ether. The government, in turn, responds that NSI failed to submit its proposal by the deadline and in the manner the Solicitation specified. Accordingly, the Court is called upon to decide what should be a simple factual question: did NSI submit a timely proposal or not? The answer to that question, however – while not involving any complex government contracting statutes or regulations – *does* require this Court to analyze and properly consider the applicable standard of review as well as the proper construction of the administrative record.

As explained below, the Court grants in-part, and denies in-part, NSI's request to supplement the administrative record. The record supplementation the Court permits, however, does not ultimately get NSI where it wants to go. Indeed, on the merits, the Court grants the government's motion for judgment on the administrative record ("MJAR"), denies NSI's MJAR, and directs the entry of judgment for the government.

## I.    Factual Background[2]

On September 2, 2020, the Agency issued the Solicitation, a small business set-aside, contemplating a single-award indefinite delivery/indefinite quantity contract. AR 166–67. The Solicitation's statement of work covers "Maintenance and Materiel Management (3M); the development of logistics packages; software engineering,

---

Cl. 289, 293 (2016) (agency properly rejected offeror's proposal when the offeror failed to timely and fully submit its proposal electronically using a third party submission portal); *Glob. Mil. Mktg., Inc. v. United States*, 118 Fed. Cl. 624, 627 (2014) (severe weather did not constitute an interruption of "normal Government processes" sufficient to fall within an exception to the "late is late" rule); *Geo-Seis Helicopters, Inc. v. United States*, 77 Fed. Cl. 633, 640 (2007) ("Courts interpreting the 'late is late' rule have adhered to the plain text of the regulation, commenting that its requirement that offerors submit their proposals on time is a 'strict rule with very limited exceptions.'" (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 173 (2005))); *Conscoop-Consorzia FRA Cooperative Di Prod. E. Lavoro v. United States*, 62 Fed. Cl. 219, 238 (2004) (bidder "chose to assume the risk of late delivery by sending its price proposal just two minutes prior to the deadline established in the solicitation" and thus the agency properly rejected the proposal as late), *aff'd*, 159 Fed. Appx. 184 (Fed. Cir. 2005); *The Sandi Grp., Inc.*, B-401218, 2009 CPD ¶ 123 (June 5, 2009) ("Our Office has long held that the late proposal rule alleviates confusion, ensures equal treatment of offerors and prevents one offeror from obtaining a competitive advantage as result of being permitted to submit a proposal later than the deadline set for all competitors." (citations omitted)).

[2] This section constitutes the Court's findings of fact drawn from the administrative record ("AR").

development, and integration; engineering support; and technical support to Naval Air Warfare Center Aircraft Division . . . and its customers." AR 185. The Solicitation provided specific instructions for proposal submissions:

> The Offeror shall submit all volumes of its proposal electronically via DoD Safe (https://safe.apps.mil/). All proposal documents must be compatible with Microsoft Office 2016 and/or the latest Adobe Acrobat Reader Portable Document Format (PDF), where applicable. An email shall be submitted to cheri.swailes@navy.mil and amy.g.davis@navy.mil no later than 10 days prior to the proposal due date requesting a "Drop-Off Request Code." The "Drop-Off Request Code" email must specify a point of contact name and email address for the Prime contractor and for each individual Subcontractor. The Prime and Subcontractor(s) will each be provided a unique "Drop-Off Request Code" which will allow them to submit proposal documents to the Government independently as needed. The Prime and Subcontractor points of contact will receive an email that contains their unique "Drop-Off Request Code" no less than 3 days prior to the proposal due date. This code authorizes access to submit proposal documents securely via DoD SAFE.

AR 272 at 2.3.[3] The Solicitation incorporates by reference FAR 52.215-1, "Instructions to Offerors-Competitive Acquisition." AR 290.[4] FAR 52.215-1(c)(3), in turn, addresses "[s]ubmission, modification, revision, and withdrawal of proposals," and provides that "[o]fferors are responsible for submitting proposals . . . so as to reach the Government office designated in the solicitation by the time specified in the solicitation." The Solicitation set a proposal deadline of October 19, 2020 at 12:00 PM EST. AR 166.

FAR 52.215-1(c)(3)(ii)(A) specifically addresses proposal timeliness, and provides:

> Any proposal . . . received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer

---

[3] "DoD SAFE" is the Department of Defense's "Secure Access File Exchange" — an electronic, internet-connected "service to make it easy for [users] to exchange unclassified files up to 8.0 GB that can't be sent through email[.]" *See* https://safe.apps.mil/ (last accessed Mar. 25, 2021).

[4] "FAR" refers to the Federal Acquisition Regulation, codified at Chapter 1 of Title 48 of the Code of Federal Regulations.

determines that accepting the late offer would not unduly delay the acquisition, and

(1) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or

(2) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or

(3) It is the only proposal received.

AR166, AR290. FAR 52.215-1(c)(3)(iii) defines "[a]cceptable evidence to establish the time of receipt at the Government installation" to include "the time/date stamp of that installation on the proposal wrapper, other documentary evidence of receipt maintained by the installation, or . . . statements of Government personnel."

According to NSI, "on the morning of Monday, October 19, 2020, at between 10:00 a.m. and 10:30 a.m. EST, NSI employees Diana M. Waldorf and Thomas M. Bock both entered the office of Mr. Bock for the purpose of uploading NSI's proposal." ECF No. 1 ("Compl.") ¶ 10. NSI contends that Mr. Bock logged into the DoD SAFE system, dragged-and-dropped 10 proposal-related files from his computer into the upload section of the SAFE system website, entered a description for each document, and had Ms. Waldorf confirm that all of the files comported with Solicitation requirements. *Id*. ¶¶ 11–13. Mr. Bock then purportedly clicked a button to commence the upload of NSI's files, and soon after, a screen appeared that indicated "Drop Off Completed" and included some language to the effect of "Your files have been sent successfully." *Id*. ¶¶ 14–17.

On October 20, 2020, Agency Contract Specialist Cheri Swailes emailed Mr. Bock to ask why NSI had decided not to submit a proposal. AR 745. Mr. Bock and Ms. Swailes then spoke on the phone, at which time Mr. Bock informed Ms. Swailes that a "successful upload of NSI's proposal had been confirmed by DoD SAFE[,]" but that he had not received any confirmation email. Compl. ¶ 28. Concerned that something had gone wrong or perhaps to prompt the Agency to investigate the apparent problem, NSI contacted the DoD SAFE Help Desk to open an incident ticket, the resolution of which both NSI and Ms. Swailes diligently pursued.[5] AR 749–51; Compl. ¶¶ 29, 31. NSI

---

[5] Ms. Swailes also opened a separate incident ticket with the DoD SAFE Help Desk in an attempt to resolve the issue. AR 773.

believed, and continues to believe, that it successfully uploaded its proposal via the DoD SAFE system. The DoD SAFE Help Desk escalated the incident several times to higher priority levels in an attempt to investigate and address the issue. AR 752, 758.

While awaiting the resolution of the incident tickets, NSI made several attempts to deliver physical copies of the proposal to the Agency, albeit after the Solicitation's October 19 deadline for the receipt of proposals. On October 20, 2020, NSI unsuccessfully attempted to physically drop off with the Agency a CD-ROM containing the proposal files, but found the Agency's office door locked and received no answer to knocking. AR 755–57. On October 24, 2020, NSI sent the CD-ROM to the Agency via mail. *Id*.

After investigating NSI's concern, the DoD Help Desk ultimately determined that NSI's proposal was never uploaded to the DoD SAFE website and closed the incident tickets. AR 783. The Agency determined that while NSI itself had not submitted any files via the DoD SAFE system in response to the Solicitation, NSI's planned subcontractors *did* successfully manage to utilize the SAFE system to upload their proposal files. *See, e.g.*, AR 742–744. In an email to Ms. Swailes, a Help Desk representative who was tasked to the matter included a screenshot of the DoD SAFE database during the time period between 10:00 AM and 11:00 AM EST, when NSI purports to have uploaded its proposal. AR 780–81. That screenshot shows that while there were 1,540 successful drop-offs using the SAFE system during that hour, there were no recorded drop-offs from NSI.[6] AR 780–81, 783. The Agency thus reasonably concluded that: (1) NSI failed to submit its proposal in a timely manner via the SAFE website; (2) NSI could not submit its proposal late via CD-ROM; and (3) as a result of NSI's failure to submit a timely proposal, NSI could not participate in the competition.

## II.    Procedural History

On November 6, 2020, NSI filed a complaint in this Court. Compl. In the complaint, NSI alleged that: (1) the Agency improperly rejected NSI's proposal; (2) assuming NSI's proposal was late, the so-called "government control" exception, *see* FAR § 52.212–1(f)(2)(i)(B), excused NSI's lateness; (3) assuming NSI's proposal was late, the lateness should be waived as a minor formality; and (4) assuming NSI's proposal was late, the Agency should have given NSI an extension to submit its proposal. *Id*. at 7. In support of NSI's complaint, NSI filed a joint affidavit from its employees, Mr. Bock and Ms. Waldorf, attesting that NSI's proposal had been submitted to the Agency in a timely manner via the SAFE system in compliance with the Solicitation's instructions. ECF No. 1-1. Accordingly, NSI requests that the Court find that NSI

---

[6] The screenshot included the following qualification: "NOTE: This does not take into account any external 'issues' that could be affecting user dropoffs -- only that DOD SAFE was operating properly." AR 781.

submitted a timely proposal and thus is eligible to compete for the procurement at issue; in the alternative, NSI requests that the Court order: (1) NSI's lateness excused or waived; or (2) the Agency to provide NSI with an extension of time within which to submit its proposal. *Id.* at 8.

On November 16, 2020, the government filed the administrative record in this matter. ECF Nos. 10, 11. On December 1, 2020, NSI filed a motion to supplement the administrative record with the declaration of its expert, Mr. Randolph E. Tipton, ECF No. 12-1 ("Tipton First Decl."), and a motion requesting that the Court require the government to supplement the administrative record with additional documents, ECF No. 13. The point of Mr. Tipton's declaration was to provide the Court with an expert opinion "by a technically qualified person . . . for the purpose of providing an explanation as to why NSI's proposal was not timely received" and to "rebut several of the arguments Defendant has made regarding why NSI's proposal was late." ECF No. 12 at 3–4. NSI claimed that because the Court was required to "conduct fact-finding on a paper record[,]" Mr. Tipton's declaration was necessary for meaningful review "because the existing record is insufficient for this purpose." *Id.* at 4.

On December 2, 2020, this Court held a status conference and subsequently vacated the existing briefing schedule, instead requiring the government to "obtain a declaration from a [DoD] expert to explain [the DoD SAFE] system's operation in the context of this case . . . [and] whether the facts Plaintiff alleges are plausible or even possible give that system's functionality." ECF No. 15. On December 11, 2020, in response to the Court's order, the government filed a declaration from its expert, Mr. Todd A. Edgell, to respond both specifically to Mr. Tipton, and to NSI's allegations, generally. ECF No. 16 ("Edgell First Decl.").

On December 17, 2020, NSI filed yet another motion to supplement the administrative record, this time requesting that the government produce additional DoD SAFE logs. ECF No. 17. On that same date, the parties also submitted a joint status report. ECF No. 18. In the status report, NSI argued that "[t]he administrative record, as supplemented by Mr. Edgell's declaration, is still incomplete" and thus insisted that yet additional supplementation was necessary. *Id.* at 4. The government responded that NSI's request was "an inappropriate, extra-record exercise" based solely on baseless speculation. *Id.* at 2.

After holding a status conference to again discuss the issues with the parties, including the contents of the administrative record, this Court issued an order to provide NSI with the opportunity to submit a revised second motion to supplement the administrative record (including, but not limited to, a second declaration from NSI's expert, Mr. Tipton, to respond to the government's expert, Mr. Edgell). ECF No. 20. The Court also granted NSI's first motion to supplement the record with the declaration of Mr. Randolph Tipton, *see* ECF No. 12, but denied, as moot, NSI's remaining two

motions to require the government to supplement the record, *see* ECF Nos. 13, 17.  On January 14, 2021, NSI filed a revised motion to supplement the administrative record, including a second declaration from Mr. Tipton.  *See* ECF No. 21; ECF No. 21-1 ("Tipton Second Decl.").  On January 28, 2021, the government filed its response to NSI's revised motion, including a second declaration from Mr. Edgell.  *See* ECF No. 22; ECF No. 22-1 ("Edgell Second Decl.").

On February 5, 2021, the Court held an oral argument primarily to address NSI's revised second motion to supplement the administrative record, which effectively requested limited discovery as to the operations of the DoD SAFE system on or around the time NSI alleged it submitted its proposal.  *See* Minute Entry, Feb. 5, 2021.  Although the Court indicated that it intended to resolve the motion predominantly in the government's favor, and that such a resolution in all likelihood would be dispositive of NSI's claims, NSI nevertheless requested the opportunity to file an MJAR.  Accordingly, the Court set a simultaneous briefing schedule for the parties' dispositive motions on the merits.  ECF No. 24.  The parties filed their respective MJARs on February 22, 2021, *see* ECF Nos. 25 ("Def. MJAR"), 26 ("Pl. MJAR"), and response briefs on March 5, 2021.  ECF Nos. 29, 30.

## III.    Standard Of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, provides this Court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  In cases involving such an action – commonly referred to as bid protests – this Court "reviews the agency's decision pursuant to the standards set forth in section 706 of title 5" – *i.e.*, the Administrative Procedure Act ("APA") standard of review.  28 U.S.C. § 1491(b)(4).  That standard of review requires the Court to determine whether an agency's procurement-related decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In particular, "we must sustain an agency's action unless the challenger can prove the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [issued a decision that] is so implausible that [the decision] could not be ascribed to a difference in view or the product of agency expertise.'"  *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) (quoting *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))); *see also Sharpe v. United States*, 935 F.3d 1352, 1358–59 (Fed. Cir. 2019).

A motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") differs from motions for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355–57 (Fed. Cir. 2005). Rather, a motion for judgment on the administrative record examines whether an agency, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review. The trial court thus makes factual findings based on the evidence in the record, "as if [the Court] were conducting a trial on the record." *Bannum*, 404 F.3d at 1357. *Bannum* thus "teaches that two principles commonly associated with summary judgment motions—that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party—do not apply in deciding a motion for judgment on the administrative record." *Zappley v. United States*, 135 Fed. Cl. 272, 276 (2012) (citing *Bannum*, 404 F.3d at 1356, and explaining that "[t]he existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full-blown evidentiary proceeding"). "Rather, such questions must be resolved by reference to the administrative record, as properly supplemented—in the words of the Federal Circuit, 'as if [the Court of Federal Claims] were conducting a trial on [that] record.'" *Zappley*, 135 Fed. Cl. at 276–77 (quoting *Bannum*, 404 F.3d at 1354, and citing *Carlisle v. United States*, 66 Fed. Cl. 627, 631 (2005)).

While the government's overall "conduct" – *i.e.*, its "procurement decision" – is subject to the "'arbitrary and capricious' standard of [the APA,] § 706," *Bannum*, 404 F.3d at 1351 (discussing 5 U.S.C. § 706(2)(A)), "[t]he substantial evidence standard of 5 U.S.C. § 706(2)(E) 'applies to the trial court's review of agency findings.'" *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 2007) (quoting *Bannum*, 404 F.3d at 1357 (citation omitted)). The Court, however, may "make[] factual findings from the administrative record in the first instance . . . 'like any finding in a bench trial.'" *Blue & Gold Fleet*, 492 F.3d at 1312 (quoting *Bannum*, 404 F.3d at 1357, and noting that the Federal Circuit "reviews such findings for clear error," *id*.).[7] Plaintiff bears the "'burden

---

[7] *See also Young v. United States*, 497 F. App'x 53, 59 n.8 (Fed. Cir. 2012) (noting that the Court of Federal Claims "may make factual determinations and legal conclusions based on the administrative record in the first instance" while the Federal Circuit "reviews such factual determinations for clear error and legal conclusions without deference"); *but see Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (explaining that "'when a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal'" such that "'[t]he entire case on review is a question of law,' and the 'complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action'" (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993))).

of proof based on the evidence in the record.'" *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018) (quoting *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum,* 404 F.3d at 1356)).

Unlike a typical, full bench trial – which, of course, consists of live testimony and is preceded by a robust discovery process – the trial court in an action pursuant to 28 U.S.C. § 1491(b) is far more constrained in what evidence the Court may receive and consider.  Indeed, the statutorily prescribed standard of review drives the more limited nature of the available "trial" process, as well as the contours of the administrative record.  With regard to the latter, our Court on occasion has described the administrative record as a "fiction."  *CCL Serv. Corp. v. United States*, 48 Fed. Cl. 113, 118 (2000); *see also Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 n.9 (2004) (collecting cases).[8]  That is not meant to be as pejorative as it sounds.  Rather, what that characterization is intended to convey is that "the administrative record in many bid protest cases . . . cannot be 'viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review[.]'"  *Alabama Aircraft*, 82 Fed. Cl. at 763 (quoting *Savantage Fin. Servs. v. United States*, 81 Fed. Cl. 300, 310 (2008)).[9]  Judge Williams succinctly described the reality of the administrative record in § 1491(b) actions, as follows:

> [A]n agency decision in a bid protest, while subject to the APA standard of review in this Court, is not a traditional agency action which generates the tidy record typically encountered in an APA review context.  Rather, . . . the agency action resulting in a contract award is the reflection of a procurement process which entails submission of competing proposals, discussions with offerors, refinement of those proposals, detailed technical and cost evaluations often

[8] Our appellate court, the United States Court of Appeals for the Federal Circuit, does not appear to have employed or endorsed that description of the administrative record.

[9] The Federal Circuit similarly explained:

> The Supreme Court has established that the [APA] does not itself require an agency to explain the basis for its decision, unless an adjudication required to be made on the record or a formal rulemaking is involved.  Contracting officers are not obligated by the APA to provide written explanations for their actions. Decisions by contracting officers are not adjudicatory decisions to be made on the record after a hearing.  Nor are they formal rulemakings.

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1337–38 (Fed. Cir. 2001) (internal citations omitted) (citing *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 655–56 (1990), and *Camp v. Pitts,* 411 U.S. 138, 142 n.3 (1973)).

> performed by different teams of Government evaluators,
> assessments of past performance, and exchanges among
> evaluators and vendors which may be captured in the most
> informal of e-mail traffic. The demarcation of such a record
> necessarily involves a judgment call on the part of the agency,
> made *ex parte* and for purposes of litigation.

*Int'l Res. Recovery, Inc. v. United States*, 59 Fed. Cl. 537, 541 (2004).

That said, the undersigned does not concur with the broader critique that an "administrative record is not a documentary record maintained contemporaneously with the events or actions included in it[,]" and instead simply "is a convenient vehicle for bringing the decision of an administrative body before a reviewing agency or a court." *Tech Systems, Inc. v. United States*, 50 Fed. Cl. 216, 222 (2001) (citing *CCL Serv. Corp. v. United States*, 48 Fed. Cl. 113, 118 (2000)). To the contrary, the standard categories of documents Judge Williams catalogued generally *are* "contemporaneous" with the agency's procurement decision subject to review.[10] Moreover, as Judge Wolski explained, "[a]lthough a 'record' assembled by an agency after a procurement decision is challenged has been characterized as a 'fiction' of sorts, . . . an agency does *not* possess the discretion to make these records whatever it says they are." *East West, Inc. v. United States*, 100 Fed. Cl. 53, 56 (2011) (emphasis added) (quoting *Orion Int'l Techs.*, 60 Fed. Cl. at 343 n.9, and citing *Tauri Group, LLC v. United States*, 99 Fed. Cl. 475, 480–81 (2011)). Instead, when the United States Supreme Court instructs that the trial court is to evaluate the "administrative record already in existence," *Pitts*, 411 U.S. at 142, that refers to and "'depends on what the agency did in reaching its decision, not what it chooses to assemble after a protest is lodged.'" *East West, Inc.*, 100 Fed. Cl. at 56 (quoting *Tauri Group*, 99 Fed. Cl. at 480–81). "This record will normally include the information relied upon by the relevant agency decision makers and their advisers in reaching the decisions being challenged, and the *contemporaneously articulated reasons* for these decisions." 100 Fed. Cl. at 56 (emphasis added).[11] Implementing that idea, this

---

[10] *But see Int'l Res. Recovery, Inc.*, 59 Fed. Cl. at 541–42 (noting that "[t]he GAO record consists not only of the documentation supporting the agency action being reviewed, but also whatever documentation and argument, including affidavits and live testimony, a party submits to GAO[,]" that "the GAO record is often submitted wholesale and designated as [part of] the administrative record by the Government[,]" and critiquing that practice because "the GAO record which contains after-the-fact explanations of the decision-making process, should not represent the metes and bounds of the administrative record on review"); *Bannum, Inc. v. United States*, 89 Fed. Cl. 184, 188 (2009) ("this Court's rules explicitly provide for the inclusion of the record before the GAO, to the extent it is more extensive, to the administrative record").

[11] *Tauri Grp.*, 99 Fed. Cl. at 480–81 (rejecting the government's "opinion that the administrative record is whatever it says it is, regardless of whether this informal compilation of materials contains all of the information relied upon by the agency in reaching the challenged decision" but concluding that "the administrative record need not consist of every single document

Court's Rules provide detailed guidance on what documents typically should be included in the administrative record.  RCFC App. C, ¶¶ 21–24.

But what is a plaintiff supposed to do when it is dissatisfied with the scope of the record the government has constructed and filed, or when the record necessarily lacks relevant documentation given the nature of the specific claims at issue?  In such circumstances, a plaintiff typically will file a motion to add documentation to the administrative record.  Such motions can be categorized into two types: "[s]upplementing the administrative record in an APA case means adding material to the volume of documents the agency considered, while admitting extra-record evidence means adding material outside of or in addition to the administrative record that was not necessarily considered by the agency."  *Safari Club Int'l v. Jewell*, 111 F. Supp. 3d 1, 4 (D.D.C. 2015) (citing *Pac. Shores Subdiv. Cal. Water Dist. v. U.S. Army Corps of Eng'rs,* 448 F. Supp. 2d 1, 5 (D.D.C. 2006)); *see SOSS2, Inc. v. United States Army Corps of Eng'rs,* 403 F. Supp. 3d 1233, 1237 (M.D. Fla. 2019) ("To supplement the administrative record means to permit review of material that the agency considered but failed to include.").

The United States Court of Appeals for the District of Columbia Circuit has developed distinct tests for deciding whether an administrative record should be supplemented or whether extra-record evidence should be added:

> Supplementation of the record is appropriate in three circumstances: "(1) if the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) if background information was needed to determine whether the agency considered all the relevant factors, or (3) if the agency failed to explain administrative action so as to frustrate judicial review."

*Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156 (D.D.C. 2012) (quoting *City of Dania Beach v. F.A.A.,* 628 F.3d 581, 590 (D.C. Cir. 2010)).  "Conclusory statements will not suffice; rather, the plaintiff 'must identify reasonable, non-speculative grounds for its belief that the documents were considered by the agency and not included in the record.'"  *Nat'l Min. Ass'n,* 856 F. Supp. 2d at 156 (quoting *Marcum v. Salazar,* 751 F. Supp. 2d 74, 78 (D.D.C. 2010)).

"A separate standard governs judicial consideration of extra-record evidence, which 'consists of evidence outside of or in addition to the administrative record that was not necessarily considered by the agency.'"  *Nat'l Min. Ass'n,* 856 F. Supp. 2d at 156 (quoting *Calloway v. Harvey*, 590 F. Supp. 2d 29, 38 (D.D.C. 2008) (internal quotation marks omitted)).  The D.C. Circuit has identified four exceptions justifying a court's

_____

related in any way to the procurement in question, [and] may be reasonably limited to materials relevant to the specific decisions being challenged").

review of "extra-record" evidence: (1) when the agency failed to examine all relevant factors; (2) when the agency failed to explain adequately its grounds for its decision; (3) when the agency acted in bad faith; or (4) when the agency engaged in improper behavior. 856 F. Supp. 150, 156–57 (citing *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997)). These exceptions are to be applied only in limited circumstances, *see Calloway*, 590 F. Supp. 2d at 38, and "in order to invoke one of these exceptions, a party seeking a court to review extra-record evidence must first establish that the agency acted in bad faith or otherwise behaved improperly, or that the record is so bare that it prevents effective judicial review," *County of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 79 (D.D.C. 2008) (internal quotations omitted) (citing *Fund for the Animals v. Williams*, 245 F. Supp. 2d 49, 57–58 (D.D.C. 2003)).

Our circuit's jurisprudence does not appear to neatly distinguish between supplementation of the administrative record, on the one hand, and the addition of extra-record evidence, on the other. For example, in *Axiom Resource Management, Inc. v. United States*, the Federal Circuit all but equated the term "supplementation" with the phrase "extra record evidence." 564 F.3d 1374, 1380 (Fed. Cir. 2009) (holding that "supplementation of the record should be limited to cases in which 'the omission of *extra-record evidence* precludes effective judicial review'" (quoting *Murakami*, 46 Fed. Cl. at 735 (emphasis added))). Nor has our Court clearly defined supplementation as the addition of evidence that the agency considered but omitted from the record. To the contrary, "allowing the record to be supplemented by evidence that the agency considered but did not include in the record might be viewed as not supplementation at all, but merely requiring that the administrative record be complete." *Murakami*, 46 Fed. Cl. at n.4.[12] Nevertheless, the Court finds the D.C. Circuit precedent instructive and persuasive insofar as the two primary Federal Circuit decisions on point are broadly consistent with the approach of other circuits, including the D.C. Circuit[13] – all

---

[12] *See also NEQ, LLC v. United States*, 86 Fed. Cl. 592, 593 (2009) ("The court views adding the two electronic messages in question as not supplementing the administrative record, *per se*, but merely as ensuring the completeness of the record. *See* RCFC App. C ¶ 22. This is particularly so as the messages in question were before the agency when it rendered its award decision."); *N. Wind Site Servs., LLC v. United States*, 142 Fed. Cl. 802, 809 (2019) ("Where a party seeks to add to the record materials that were generated or considered by the agency during the procurement and decisionmaking process, such a request is viewed as a request to complete the administrative record."); *BHB Ltd. P'ship v. United States*, 147 Fed. Cl. 226, 229 (2020) ("By motion to complete the record, a party seeks to add documents that are relevant to the challenged agency decision and were considered by the agency in reaching its decision . . . By motion to supplement, a party seeks to add evidence to an otherwise complete record."); *Tech Sys., Inc. v. United States*, 97 Fed. Cl. 262, 265 n.3 (2011) ("Our Court has recognized that adding this category of information 'might be viewed as not supplementation at all, but merely requiring that the administrative record be complete.'" (quoting *Murakami*, 46 Fed. Cl. at 735 n.4)).

[13] In *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), the D.C. Circuit explained that extra-

of which are animated by the same concern: "to guard against courts using new evidence to 'convert the arbitrary and capricious standard into effectively de novo review.'"  *Axiom Res. Mgmt.*, 564 F.3d at 1380 (quoting *Murakami*, 46 Fed. Cl. at 735, *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)); *see also Lewis v. United States*, 476 F. App'x 240, 243 n.2 (Fed. Cir. 2012) (citing cases for the proposition that supplementation or extra-record evidence exceptions "apply only under extraordinary circumstances" (quoting *Voyageurs Nat. Park Ass'n v. Norton,* 381 F.3d 759, 766 (8th Cir. 2004))).[14]

Thus, in *Axiom,* the Federal Circuit emphasized that "the parties' ability to supplement the administrative record is limited," 564 F.3d at 1379, such that the "focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA," *id.* at 1381.  The Federal Circuit's binding decision in *Axiom* – consistent with Supreme Court jurisprudence – ultimately requires that we determine whether supplementation of the administrative record is "necessary in order not 'to

---

record evidence was reviewable if it fell within one of eight exceptions, but that is no longer an accurate description of the state of the law in that circuit.  *See Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior,* 667 F. Supp. 2d 111, 115–16 (D.D.C. 2009) (noting the narrowing of the *Esch* exceptions).  Moreover, the Federal Circuit criticized the *Esch* exceptions in *Axiom*, 564 F.3d at 1380.  *See Lab. Corp. of Am. v. United States*, 108 Fed. Cl. 549, 557 n.8 (2012) ("In forceful terms, the Federal Circuit rejected the lenient approach to the use of extra-record evidence reflected in *Esch . . . .*").  In *Axiom,* our appellate court concluded that "[r]elying on *Esch . . .* is problematic in at least two respects.  First, the eight exceptions to the rule against extra-record evidence described in *Esch* originated in an article, predating [the Supreme Court's decision in] *Florida Power & Light*[.]"  564 F.3d at 1380 (citing Steven Stark & Sarah Wald, *Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Action*, 36 Admin. L.Rev. 333, 336 (1984)).  "Second, and more critically," the Federal Circuit recognized that "*Esch*'s vitality even within the D.C. Circuit is questionable in light of more recent opinions by that court which demonstrate a more restrictive approach to extra-record evidence."  564 F.3d at 1380; *see also Miller v. United States*, 119 Fed. Cl. 717, 726 (2015) ("The *Axiom* panel criticized a decision of this court which permitted supplementation of the administrative record in a bid protest, and criticized the trial court's over-broad reliance on *Esch v. Yeutter, . . .* an opinion which provides a list of justifications for the supplementation of the administrative record of an agency action."); *Murakami v. United States*, 46 Fed. Cl. at 735 n.4 (critiquing *Esch*) (cited with approval in *Axiom*, 564 F.3d at 1380).

[14] In *Voyageurs Nat. Park Ass'n*, the United States Court of Appeals for the Eighth Circuit explained that "[b]y confining judicial review to the administrative record, the APA precludes the reviewing court from conducting a de novo trial and substituting its opinion for that of the agency."  381 F.3d at 766 (noting that while "certain exceptions have been carved from the general rule limiting APA review to the administrative record[,] [t]hese exceptions apply only under extraordinary circumstances, and are not to be casually invoked unless the party seeking to depart from the record can make a strong showing that the specific extra-record material falls within one of the limited exceptions").

frustrate effective judicial review.'" *Id.* (quoting *Camp,* 411 U.S. at 142–43).[15]  Similarly, in an earlier decision, the Federal Circuit held that discovery or record supplementation is justified when "required for meaningful judicial review," *Impresa Construzioni,* 238 F.3d at 1338, or when "the record is insufficient for the Court to render a decision," *Portfolio Disposition Mgmt. Group, LLC v. United States,* 64 Fed. Cl. 1, 12 (2005).  In limited circumstances, "[t]he Supreme Court's . . . decision in *LTV,* and earlier decisions in *Overton Park* and *Pitts,* make clear that, even if the agency is not obligated to provide reasons [for its decision], a court may nonetheless order the agency to provide explanation if such an explanation is required for meaningful judicial review."  *Impresa Construzioni,* 238 F.3d at 1337–38 (citing *Pension Benefit Guaranty Corp.*, 496 U.S. at 654; *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971); *Camp*, 411 U.S. at 142–43).

For plaintiffs seeking discovery in a record review case, Supreme Court decisions also require trial courts to recognize that "the agency decision is entitled to a presumption of regularity."  *Impresa Construzioni,* 238 F.3d at 1337–38 (citing *Bowen v. Am. Hosp. Assn.,* 476 U.S. 610, 626–27, (1986), *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 n. 9 (1983), *United States v. Chem. Found., Inc.,* 272 U.S. 1, 14–15 (1926)).  "Because of that presumption of regularity, the agency should not be required to provide an explanation [of its decision] unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious."  *Impresa Construzioni*, 238 F.3d at 1337–38 (holding that "[t]he litigant challenging that presumption necessarily bears a heavy burden").

Accordingly, this Court should refuse "to supplement the record," to permit further "discovery," or "to otherwise add to the record evidence, not previously possessed by the agency" merely because the proponent of such measures believes that it will "improve the court's 'understanding' of a case."  *NEQ, LLC v. United States*, 86 Fed. Cl. 592, 593 (2009) (reasoning that "the theoretical bases for considering such materials are questionable, at best, and derive from portions of the opinion in *Esch v. Yeutter* . . . that appear to be in heavy tension with numerous Supreme Court precedents").  In sum, while the Federal Circuit has approved the deposition of a contracting officer, for example to "explain[] the basis for his responsibility

---

[15] *See Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1310 n.3 (Fed. Cir. 2016) (discussing *Axiom* and cautioning that "this court has previously found abuse of discretion where a trial court allowed supplementation of the record without first making the required determination"); *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1331–32 (Fed. Cir. 2018) (concluding "that the trial court abused its discretion by supplementing the record, and relying on the supplemental evidence to reach its decision" where the trial court failed "to explain why the evidence omitted from the record frustrated judicial review as to the ultimate question of whether the award of a sole-source contract . . . was arbitrary and capricious").  A trial court's "conclusory statements that it could not conduct effective judicial review without the supplemented material . . . are insufficient under *Axiom*."  880 F.3d at 1332.

decision . . . , it did so recognizing that the circumstances warranting such a deposition are 'rare.'" *NEQ,* 86 Fed. Cl. at 593–94 (quoting *Impresa Construzioni,* 238 F.3d at 1338, and explaining that "[t]he court, therefore, did not hold that depositions in bid protest cases should be taken simply to flush out the rationale for an agency's decision").[16]

On the other hand, the Federal Circuit itself does not appear to have fleshed out what constitutes evidence or additional documentation necessary for "meaningful judicial review." Some broad and relatively uncontroversial general parameters may be extracted, however, from the decisions of the Court of Federal Claims. On the one hand, "this Court has precluded supplementation of the administrative record with declarations that contain 'post-hoc contentions of fact and argument.'" *PTC, Inc. v. United States,* 143 Fed. Cl. 770, 780–81 (2019) (quoting *L-3 Commc'ns EOTech, Inc v. United States,* 87 Fed. Cl. 656, 672 (2009)).[17] On the other hand, while "[t]he Court has a responsibility to ensure that a bid protest proceeding is not converted into a *de novo* review, . . . this requirement must be balanced against the obligation to ensure that the position of both parties is fully understood" – not by supplanting the information in the existing record or by "introduc[ing] facts outside the administrative record" but rather "to take a deeper dive into information that is already in the administrative record." *FirstLine Transportation Sec., Inc. v. United States,* 116 Fed. Cl. 324, 326–27 (2014) (permitting expert declaration "not [to] substitute [his] judgment for the agency's judgment" but rather where the testimony contained "calculations based on data already contained in the administrative record, so that the Court can better understand the record"). This tension[18] is why, "[l]ike all broad standards, applying the guidance

---

[16] *But see CRAssociates, Inc. v. United States,* 95 Fed. Cl. 357, 376 n.15 (2010) ("There is a little tension between the notion that an agency cannot provide a new reason for a prior decision, but can provide further explanation for a decision already made."); *cf. Pitts,* 411 U.S. at 142–43 ("If . . . there was such failure to explain administrative action as to frustrate effective judicial review, the remedy [is] . . . to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.").

[17] *Acrow Corp. of Am. v. United States,* 96 Fed. Cl. 270, 279 (2010) (GAO protest filings do not supplement the agency's administrative record).

[18] *Compare Int'l Res. Recovery, Inc. v. United States,* 59 Fed. Cl. 537, 541–42 (2004) (quoting *Pikes Peak Family Hous., LLC v. United States,* 40 Fed. Cl. 673, 677 (1998), for the proposition that "[e]ffective judicial review of an agency's exercise of discretion is irreconcilably at odds with the notion that the reviewing court's inquiry must be confined to an administrative record that is likewise the product of the agency's sole discretion"), *with Joint Venture of Comint Sys. Corp. v. United States,* 100 Fed. Cl. 159, 165–66 (2011) (explaining that "[a]lthough courts have employed a 'flexible approach' in numerous bid protests to determine the corpus of evidence that will be considered, *Cubic Applications, Inc. v. United States,* 37 Fed. Cl. 345, 350 (1997)," administrative record supplementation "must be extremely limited" to avoid effectively converting the applicable arbitrary and capricious standard of review into de novo review (citing *Murakami,* 46 Fed. Cl. at 735)).

from *Axiom* turns on the facts of each individual case." *Id.* at 327 (distinguishing *Al Ghanim Combined Grp. v. United States,* 56 Fed. Cl. 502 (2003), as a case in which "the Court rejected the protester's attempt to supplement the record with . . . expert declarations . . . because the argument boiled down to a matter of contract interpretation, which is outside the scope of proper supplementation," while "the present case is sufficiently complex such that the Court needs the expert assistance . . . to evaluate Plaintiff's arguments and the issue of prejudice").

With these broad principles in mind, the Court next turns to NSI's pending motion to supplement the administrative record.

## IV.     The Court Grants In-Part, And Denies In-Part, NSI's Request To Supplement The Administrative Record

We begin with NSI's central claim, which is as straightforward as they come: pursuant to the Solicitation's requirements, NSI properly submitted its proposal in a timely manner, or at least in a manner sufficient to fall within the FAR's government control exception, but the government erroneously concluded that NSI failed to submit a proposal. Pl. MJAR at 2. In that regard, the government indeed has no record substantiating that NSI submitted a proposal. At the very least, the government's initial administrative record filing supports the government's conclusion that NSI failed to submit its proposal in the required manner insofar as the government cannot locate it anywhere in its systems or records. AR 745; *see also* Def. MJAR at 12. NSI responds, essentially, that the government's electronic submission system – the DoD SAFE website – somehow lost NSI's proposal. Pl. MJAR at 10–14. In other words, with regard to the administrative record as initially constructed, NSI argues that the absence of evidence (in the form of its missing proposal) proves nothing and is perfectly consistent with NSI's claim that it correctly submitted a timely proposal, but that the government's system malfunctioned.

At the outset of this case, the Court admittedly was highly sympathetic to NSI's position. How could NSI possibly demonstrate that the government is at fault for a proposal that is not in the procurement record? NSI's protest arises from the very omission of evidence upon which the Agency relies. Put differently, the very fact that the administrative record is devoid of any indication that NSI submitted its proposal means that evidence supporting NSI's claim necessarily would have to come from outside of the record the government assembled and filed as part of this case. Moreover, given the technical nature of the electronic system at issue, the Court could not initially evaluate whether the absence of information indeed demonstrated anything at all. These are precisely the type of circumstances in which extra-record evidence should be considered. *VSolvit, LLC v. United States,* 151 Fed. Cl. 678, 686 (2020) ("The Court cannot conceive of a way, except in the rarest of cases, that a protestor plausibly could succeed on the merits of this particular type of solicitation challenge without

introducing extra-record evidence as to the information that the protestor believes was missing from a solicitation . . . . Put differently, the Court is highly skeptical that an administrative record would ever contain the evidence that would allow a protestor to succeed on the merits of this type of solicitation challenge.").[19]

At an early status conference to discuss the case, the Court employed the following hypothetical. Assume an offeror contends that it physically delivered a proposal to a government office location, in a timely manner, and in full compliance with a solicitation's instructions. The government later informs the offeror that it has no record of the proposal having been delivered. If the government has comprehensive security video coverage of the only entrance to the office building, and there is no video of any of the offeror's personnel showing they entered the building to deliver the proposal, the absence of evidence would almost certainly be sufficient to disprove the offeror's claim. Conversely, if the government does not maintain any video surveillance or if there is no security or visitor log of any kind, the mere fact that the government has no record of a delivery does not prove anything at all.

Accordingly, the Court, *sua sponte*, determined that the administrative record required more context before the Court could conclude anything meaningful from the absence of information in the administrative record. In particular, the Court, as noted above, ordered the government to investigate, in more detail, the operations and functionality of the DoD SAFE system. ECF No. 15. The Court also decided it would consider a declaration from NSI's expert to explain NSI's view of the workings of the electronic system and to offer an opinion on the likelihood that the system (or the government more generally) somehow is at fault for the Agency's inability to locate NSI's proposal. In sum, the purpose of the Court's considering such extra-record evidence was to assess to what extent the agency was able to conclude definitively that NSI did not submit a timely proposal via the electronic system in compliance with the Solicitation. This is consistent with the Federal Circuit's instruction that the trial court should permit record supplementation only where the existing record is insufficient to permit meaningful review. *Axiom*, 564 F.3d at 1381; *see also Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156 (D.D.C. 2012) (extra-record evidence is permissible to decide whether "the agency failed to examine all relevant factors" or "when the agency failed to explain adequately its grounds for its decision").

---

[19] *See also Orion Intern. Tech.*, 60 Fed. Cl. at 343 ("[T]he record may be supplemented with . . . relevant information that by its very nature would not be found in an agency record . . . ."); *VSolvit*, 151 Fed. Cl. at 685 (holding that extra-record evidence is proper where the Court requires "'knowledge possessed by offeror and agency personnel of a highly technical and complex nature, requiring explication via affidavits or expert testimony'" (quoting *East West, Inc. v. United States*, 100 Fed. Cl. 53, 57 (2011) (citations omitted))).

Pending before the Court, however, is NSI's revised second motion to require the government to supplement the record with relevant documents. ECF No. 21. Although NSI attached to its motion a second declaration from its expert, Mr. Tipton, *see* Tipton Second Decl., this latest declaration is not directed towards explaining the administrative record as it now exists, but rather argues that "the Administrative Record is still lacking many relevant documents." ECF No. 21 at 2. In particular, NSI argues that the government "has still failed to provide relevant information regarding the functioning – or malfunctioning – of the DoD SAFE system on October 19, 2020." *Id.* In essence, NSI argues that the further supplementation is necessary because the administrative record continues to "lack[] any meaningful explanation or context." *Id.* NSI seeks an order requiring the government to provide sufficient "detail to enable a credible audit of activities occurring between NSI and the DoD SAFE website [during the] morning" NSI allegedly attempted to upload its proposal. *Id.* at 5.

The government opposes NSI's further supplementation request for a number of reasons. First, the government contends that NSI's motion improperly focuses on proving that NSI simply *accessed* the DoD SAFE website during the relevant time period, rather than providing evidence that NSI actually properly uploaded and submitted its proposal. ECF No. 22 at 5–6. Second, the government contends that NSI's motion "urges the court to sanction an inappropriate, extra-record exercise based entirely upon speculation," *id.* at 6, which the government maintains is precluded by binding precedent. The government addresses Mr. Tipton's assertions about the DoD SAFE system by relying on a second declaration of its own expert, Mr. Edgell, *see* Edgell Second Decl., arguing that: (1) Mr. Tipton bases his opinions on the incorrect conclusion that a particular application (NetIQ Sentinel) is used by DoD SAFE when that is not the case; (2) the application logs that NSI requests either no longer exist or do not show what Mr. Tipton believes they do; and (3) "even if the relevant application logs had been maintained, they would not reflect a successful drop-off [by NSI]." *Id.* at 7–8. Third, the government debunks Mr. Tipton's theory that other trouble tickets received by the DoD SAFE Help Desk recorded the same issue encountered by NSI; in fact, the other tickets concerned entirely different issues than that experienced by NSI. *Id.* at 9. Finally, the government again corrects Mr. Tipton's assumptions about the ZENDTO software used as part of the DoD SAFE system. Although Mr. Tipton hypothesized that the ZENDTO software is a version with known bugs that causes it to malfunction, it turns out that the version actually in use does not have a history of such issues. *Id.* at 9–10. The government also points out that the bugs experienced by users of the most recent version of the ZENDTO software are not the same bugs which NSI claims to have experienced. *Id.* at 10–11.

For the same reasons the Court agreed that it was appropriate to consider the initial declarations from the parties' respective experts, the Court hereby grants, in-part, NSI's pending motion: the Court will consider Mr. Tipton's second declaration only to the extent it provides a further explanation of NSI's view as to the technical inner-

workings of the DoD SAFE system.  *SOSS2*, 403 F. Supp. at 1237 ("A party moving to admit extra-record evidence must show either that the agency's ineffective explanation of an action frustrates judicial review or that technical or complex terms require recourse to an extra-record explanation.").  The Court likewise will consider Mr. Edgell's second declaration in response.  ECF No. 24.  The Court, however, declines to order the government to engage in what amounts to discovery (*i.e.*, further supplementation of the administrative record with extra-record evidence).

First, discovery typically is not available in APA cases.  *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011).  Indeed, even "limited" discovery is only available where "a party makes a significant showing—variously described as a strong, substantial, or prima facie showing—that it will find material in the agency's possession indicative of bad faith or an incomplete record, it should be granted limited discovery."  *Id.* at 488 (quoting *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 2010 WL 8917910, slip op. at 3 (D.D.C. June 4, 2010)); *Baptist Mem'l Hosp.-Golden Triangle v. Sebelius*, 566 F.3d 226, 230 (D.C. Cir. 2009) (limited extra-record discovery only appropriate "when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review"); *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 339 (D.C. Cir. 2011).

Second, "when a party seeks to supplement the administrative record with particular documents[,]" that party must "overcome the standard presumption that the 'agency properly designated the Administrative Record.'"  *Amfac Resorts, L.L.C. v. U.S. Dep't of Interior,* 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (quoting *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 740 (10th Cir. 1993)).  A number of this Court's decisions have recognized that presumption.  *See, e.g., BHB Ltd. P'ship v. United States,* 147 Fed. Cl. 226, 229 (2020) ("The government's designation of the AR is deemed presumptively correct."); *Poplar Point RBBR, LLC v. United States*, 145 Fed. Cl. 489, 494 (2019) ("Ordinarily, the government's designation of an administrative record is entitled to a presumption of completeness; however, courts have recognized that this can be rebutted with clear evidence to the contrary."); *Smith v. United States*, 114 Fed. Cl. 691, 695 (2014) ("Generally, the government receives a rebuttable presumption that it has properly designated the administrative record."), *aff'd*, 611 F. App'x 1000 (Fed. Cir. 2015).  At a minimum, the party seeking such additional documentation must show it is "at least somewhat likely that discovery will reveal that an agency acted improperly or provided an incomplete record . . . ."  *Comm. of 100 on the Fed. City v. Foxx*, 140 F. Supp. 3d 54, 59–60 (D.D.C. 2015).  As the United States District Court for the District of Columbia explained:

> Plaintiffs bear a "heavy burden" in seeking to overcome this presumption in order to supplement the record.  *WildEarth Guardians v. Salazar,* 670 F. Supp. 2d 1, 6 (D.D.C. 2009). To carry this burden, "plaintiff[s] 'must identify reasonable, non-

> speculative grounds for [their] belief that the documents were
> considered by the agency and not included in the record.'"
> *Sara Lee Corp. v. Am. Bakers Ass'n,* 252 F.R.D. 31, 34 (D.D.C.
> 2008), quoting *Pac. Shores,* 448 F.Supp.2d at 6. "Plaintiff[s]
> cannot merely assert that other relevant documents were
> before the [agency] but were not adequately considered." *Id.*
> They "must do more than imply that the documents at issue
> were in the [agency's] possession. Rather, plaintiff[s] must
> prove that the documents were before the actual
> decisionmakers involved in the determination." *Id.* (citations
> omitted).

*Safari Club Int'l v. Jewell*, 111 F. Supp. 3d 1, 4 (D.D.C. 2015).

NSI has not met its "heavy burden." Despite NSI's contention that the requested DoD SAFE documents will provide enough "detail to enable a credible audit of activities occurring between NSI and the DoD SAFE website of that morning," *see* ECF No. 21 at 5, the government has provided compelling affidavits from its expert indicating that the logs NSI seeks either no longer exist or never did. Edgell Second Decl. ¶¶ 14–16, 21. Furthermore, the government's expert, Mr. Edgell, has concluded definitively that "even if logs could theoretically be obtained for the various way-points between Mr. Bock's computer and the DoD SAFE server, they would not show whether the drop-off was successful." *Id.* ¶ 18. Accordingly, there is no indication that the initial record is incomplete, and NSI has not demonstrated the existence of additional "information that is necessary for effective judicial review" or that there is documentation that either "was or should have been considered by the agency." *East West, Inc.*, 100 Fed. Cl. at 57. Additionally, there is no evidence – or even a credible allegation – of bias or bad faith on the part of the government in its designation of the administrative record. The Court has reasonably indulged NSI's concerns and questions, but we decline any further journey down the rabbit-hole.

## V.   The Court Denies NSI's Motion For Judgment On The Administrative Record And Grants The Government's Cross-Motion For Judgment On The Administrative Record

NSI, in its MJAR, contends that it submitted a timely proposal in response to the Solicitation, while the government contends in stark contrast that it never received NSI's proposal. Pl. MJAR at 2–4; Def. MJAR at 2. At the end of the day, however, NSI's arguments amount to nothing more than a grievance that it simply cannot, to its satisfaction, verify whether the government is telling the truth. But, as discussed *supra*, that is neither a sufficient basis for this Court to order supplementation (or discovery), nor is that sufficient to support judgment in NSI's favor. In that regard, the government does not have the burden of proof in this case. *Conscoop-Consorzia*, 62 Fed. Cl. at 236

(quoting *Cal. Marine Cleaning, Inc. v. United States*, 42 Fed. Cl. 281, 297 (1998)).  In any event, the administrative record – particularly in light of the various expert declarations – gives the Court great confidence in finding, as a factual matter, that NSI's proposal was not submitted to the Agency in compliance with the Solicitation's instructions and prior to its deadline.  Given that finding, the Court cannot possibly conclude that the government has acted arbitrarily, capriciously, or otherwise contrary to law.  Accordingly, NSI cannot prevail on any of its claims for relief and the government is entitled to judgment.

NSI's contention that its proposal was submitted in a timely manner – or that it was actually submitted at all – rests primarily upon the October 27, 2020 joint affidavit of NSI's employees, Ms. Waldorf and Mr. Bock.  Pl. MJAR at 13 ("[T]his protest boils down to the credibility of the individuals who provided sworn declarations."); ECF No. 1-1.  Such a conclusory, self-serving affidavit – absent any objective supporting evidence – is insufficient to overcome the considerable evidence the government presents.

First, the government's DoD SAFE expert, Mr. Edgell, directly refutes NSI's contention that its employees received a "Drop Off Completed" notification from the DoD SAFE system.  Edgell First Decl. ¶ 14.  After explaining the functionality of ZENDTO (one of the DoD SAFE software components), Mr. Edgell concluded that "it would be impossible for any user . . . to receive a 'Drop-Off Completed' webpage without all of the preceding steps in the ZENDTO process haven taken place successfully." *Id.*  Because the ZENDTO process itself includes a step in which a database is updated to reflect a successful upload, something that did not occur in this case, the ZENDTO process was not completed successfully. *Id.*  Thus, NSI's assertion that its employees received confirmation of a successful upload is completely undermined by the evidence explaining the software's function, including Mr. Edgell's conclusion that "the allegations in the November 6, 2020 complaint and the statements in the October 27, 2020 joint affidavit are not 'plausible or even possible' given DoD SAFE's functionality." *Id.*

Second, notwithstanding NSI's speculation that the DoD SAFE system may have malfunctioned, there is ample evidence in the record to support the government's contention that the system was functioning properly on and around the date proposals were due.  On October 19, 2020, the day that NSI allegedly submitted its proposal, 18,261 uploads via the DoD SAFE system occurred across the platform with no identifiable abnormalities.  Edgell First Decl. ¶ 15.  In fact, during the specific hour period when NSI purports to have uploaded its proposal, DoD SAFE had 207 successful uploads across the platform. *Id.*  Additional evidence in the record demonstrates that no other offeror for the Solicitation had any problem successfully completing a proposal upload, *see* AR 838–41, AR 843–51, AR 854–57, AR 860–61, AR 866–67, AR 871–79, and, indeed, NSI's own proposed subcontractors likewise successfully uploaded their respective proposal components, as well.  AR 718, 724, 730, 742.

NSI relies on the existence of "trouble tickets" submitted to the DoD SAFE Help Desk during the relevant period to show that other users also experienced problems utilizing the system.  Pl. MJAR at 13.  Mr. Edgell adequately refutes this contention as well.  He specifically examined the topics of each of the tickets received during the period beginning two days before and ending two days after NSI's alleged proposal submission, and none of those tickets reflect the issue NSI claims to have experienced:

> Of those 69 tickets, 40 were related to CAC card issues, 23 were general DoD SAFE usage questions, one was related to reported spillage, one was related to user network configuration, one was a drop-off request code question, and one was related to a DoD certificate authority (CA) issue (i.e., relating to what is and what is not a trusted site).  The remaining two tickets were related to NSI's proposal submission issue.

Edgell Second Decl. at 4–5.[20]  According to Mr. Edgell's explanation, none of the tickets – other than the two submitted by NSI itself – were related to submission issues with the DoD SAFE system (i.e., upload or "drop-off" problems).  Mr. Edgell also successfully refuted Mr. Tipton's contention that the ZENDTO platform used by DoD SAFE has a history of glitches by clarifying that the ZENDTO version currently used by DoD SAFE is not the one which Mr. Tipton critiqued, but instead is one which has no recorded history of issues.[21]  ECF No. 22 at 9–10.  In sum, the Court agrees with the government that the system was functioning properly during the relevant period.[22]

---

[20] A "CAC" card refers to a user's common access card necessary for use of the DoD SAFE system.

[21] NSI cites *GSI Construction Corporation, Inc.*, B-418967, 2020 CPD ¶ 334 (Oct. 28, 2020), in an attempt to demonstrate that the DoD SAFE system is somehow critically and routinely plagued with problems.  Pl. MJAR at 7.  In *GSI*, two contractors allegedly uploaded their proposals to the DoD SAFE system and received confirmation of successful uploads, only to be later informed that the agency had not received their proposals.  *Id.*  The GAO denied GSI's protest, noting that "[w]hen transmitting a proposal electronically, it is an offeror's responsibility to submit its proposal sufficiently in advance of the time set for receipt of proposals to ensure proper delivery of the proposal and timely receipt by the agency."  Thus, to the extent *GSI* has any relevance here, it demonstrates that NSI had a responsibility to ensure that its proposal was uploaded on time.  Even assuming *arguendo* that the DoD SAFE system had malfunctioned, NSI could have avoided a tardiness problem had NSI left ample time to resolve any difficulties rather than attempting to submit its proposal an hour before it was due.

[22] NSI also attempts to use Mr. Edgell's concession that "computers and software can be flawed, and that bugs and other issues with computers and software are continually being discovered and addressed," *see* Pl. MJAR at 13, to show that the DoD SAFE system is not infallible.  While the Court has no trouble agreeing that no system functions perfectly at all times and under all

Third, NSI references Mr. Bock's browser history – which shows that he made two separate connections on the date in question to the DoD SAFE website during the relevant time – as evidence that NSI's proposal was successfully submitted.  Pl. MJAR at 10; Tipton First Decl. ¶ 14.  But that browser history only shows that someone visited the website.  The fact that Mr. Bock or another NSI employee visited the DoD SAFE website does not provide sufficient evidence – or really any evidence at all – that NSI uploaded its proposal in a timely manner and per the Solicitation's requirements.

Fourth, NSI incorrectly invokes the so-called government control exception to the "late-is-late" rule to argue that the Agency is required to consider its proposal.  Pl. MJAR at 12, 14 (discussing FAR 52.212-1(f)(2)(i)).  That exception applies if four requirements are satisfied: (i) the offer is received before the award is made; (ii) consideration of the offer would not unduly delay the acquisition; (iii) the offer was received at the government installation designated for receipt of offers; and (iv) the offer was under the government's control prior to the time set for receipt of offers.  FAR 52.212-1(f)(2)(i).  The government concedes that the first condition is satisfied, because NSI mailed a CD-ROM with its proposal to the Navy, which it received before making an award.  ECF No. 29 ("Def. Resp.") at 4.  The second condition is similarly satisfied, as the government concedes that "delaying award a short while longer would not harm the Navy . . . ."  Id.  In addressing the third and fourth conditions, however, there is no evidence, other than the bald assertions of NSI's employees, supporting the conclusion that NSI uploaded its proposal in a timely manner or that the government received it before the Solicitation's submission deadline.  To the contrary, the government presents significant evidence that NSI's proposal was not, in fact, timely uploaded or *ever* received by the DoD SAFE system, effectively the government's "installation designated for receipt of offers."  *See* FAR 52.212-1(f)(2)(i)(B).  The mailed CD-ROM is irrelevant because it was sent to, and received by, the Navy after "the time set for receipt of offers" and in a manner not permitted by the Solicitation.  Def. Resp. at 4.

NSI relies primarily on *Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564 (2013), to argue that the government control exception should apply in the instant case.  In *Insight*, the offeror submitted a timely proposal via email, which was promptly received by an initial government server but encountered errors in clearing security checks necessary for transmittal to a second server.  *Id.* at 570.  The emailed proposal thus did not reach the contracting officer's inbox until after the proposal deadline.  *Id.*  In rejecting the government's invocation of the "late is late" rule, this Court applied the government control exception, holding that the government had acted arbitrarily in refusing to consider the proposal.  *Id.* at 581.  The critical fact was the time when the proposal first hit a government server (and thus was within the government's control).

---

circumstances, ample evidence in the record supports the government's contention that the system was operating properly at the time that NSI purports to have uploaded its proposal.

*Insight* is inapposite.  While it was undisputed in *Insight* that the offeror's proposal had reached a government server well before the proposal deadline, here, in contrast, there is no concrete, contemporaneous evidence that NSI ever submitted its proposal, let alone that it was received by the DoD SAFE system before the submission deadline.  Indeed, the only evidence supporting NSI's claim is the affidavit from its employees.  That assertion, however, is entirely undermined by the fact that the government conducted a search of the DoD SAFE database for Mr. Bock's IP address,[23] which demonstrated that while his IP address had connected to DoD SAFE seventeen times in 2020, it did not connect to the system at all in September or October 2020, the time during which NSI's proposal was allegedly uploaded.  Edgell First Decl. ¶ 18.  This evidence, considered in conjunction with Mr. Edgell's assertion that it would be impossible for NSI to have received an electronic upload confirmation without successfully completing all steps of the submission process (including an electronic logging of the uploaded proposal), refutes NSI's contention that its proposal reached a government server before the Solicitation deadline (or at all).  The government control exception does not apply in this case.[24]

Finally, the Court notes that NSI "was clearly the 'least cost avoider' in this situation[.]"  *Extrusion Painting, Inc. v. Awnings Unlimited, Inc.*, 40 F. App'x 97, 101–02 (6th Cir. 2002); *see Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.*, 185 F.3d 732, 743 (7th Cir. 1999) (explaining that rules should be set to impose contractual liability on the party who is the "least cost avoider" – that is, the party who can avoid the mistake at the lowest cost).  NSI could have avoided any alleged problem with the DoD SAFE system by attempting to upload NSI's proposal with more time to troubleshoot,[25] or, better yet,

---

[23] An IP address is "**personally identifiable information** that is automatically captured by another computer when any communications link is made over the Internet" and is unique to each computer.  *See* Russ Smith, *IP Address: Your Internet Identity* (Mar. 29, 1997), https://www.ntia.doc.gov/legacy/ntiahome/privacy/files/smith.htm (emphasis in original).

[24] NSI also compares the government's conduct in this case to that at issue in *Insight*, in which this Court admonished the agency for "approach[ing] questions involving the timeliness of an electronic submission under FAR § 52.212–1(f)(1) with the zeal of a pedantic schoolmaster awaiting a term paper."  Pl. MJAR at 12 (citing *Insight*, 110 Fed Cl. at 754).  The Court agrees with the government that "all evidence suggests the contrary is true" in this case. Def. Resp. at 5.  Ms. Swailes not only proactively contacted NSI to inquire as to why it had not submitted a proposal, but also diligently pursued a resolution with the DoD SAFE Help Desk for over a week in an attempt to assist NSI.  AR 745, 773–785.

[25] *See Conscoop-Consorzia,* 62 Fed. Cl. at 237 ("[T]he offeror assumes the risk of an untimely delivery when it fails to allow sufficient time to submit its proposal before the deadline."); *Pmtech, Inc.*, B-291082, 2002 CPD ¶ 172 (Oct. 11, 2002) ("We view it as an offeror's responsibility, when transmitting its proposal electronically, to ensure the proposal's timely delivery by transmitting the proposal sufficiently in advance of the time set for receipt of proposals to allow for timely receipt by the agency.").

NSI could have taken a screenshot or printed a hardcopy of the alleged successful upload notification NSI asserts it received.

The fact is that while the government cannot definitively prove that NSI did *not* submit its proposal, except by pointing to the lack of any such evidence in the Agency's record system, such lack of evidence is itself probative and sufficient to end this case in the government's favor, particularly in light of the detailed explanation its expert provided to the Court.  *See* Fed. R. Evid. 803(10) (allowing evidence that "a diligent search failed to disclose a public record or statement if: (A) the testimony or certification is admitted to prove that (i) the record or statement does not exist; or (ii) a matter did not occur or exist, if a public office regularly kept a record or statement for a matter of that kind"); *United States v. Dizon*, 15 F.3d 1091 (9th Cir. 1994) ("Here, testimony was presented that inspectors were required to sign the forms if a search occurred. No signature was found on the forms.  The absence of a signature thus could be used to prove that no search occurred."); *United States v. Chkuaseli*, 732 F. App'x 747, 758 (11th Cir. 2018) ("Even though Marlett was not the custodian of the State Department's records, the Federal Rules of Evidence allowed him to testify that his searches of State Department databases for information about the passengers yielded no results."); *Khudan v. Lee*, 2016 WL 4735364, at *4 (S.D.N.Y. Sept. 8, 2016) (concluding that "Defendants may offer [the] declaration pursuant to Rule 803(10), which exempts from the hearsay bar statements offered to prove the absence of a public record after a diligent search in order to prove that a matter did not occur"); *United States v. Parker*, 761 F.3d 986, 992 (9th Cir. 2014) (holding that "Rule 803(10) simply requires 'testimony' that a diligent search did not turn up a public record" but the government need not produce the actual custodian of the records "to establish the absence of a record").

The Court recognizes that in making the factual findings that NSI failed to upload its proposal in a timely manner and that the government is not responsible for that failure, the Court necessarily rejects the testimony of NSI's employees to the contrary.  To put it bluntly, however, the government's and NSI's respective factual assertions are mutually exclusive.  Whether NSI's witnesses are merely mistaken about what they saw on their screen (*i.e.*, the alleged electronic upload confirmation) or there is an alternative explanation, the Court need not resolve that question.  Suffice it to say, the Court concludes that the government's account of what transpired is amply supported by, and indeed better explains, the record evidence.  Because the Court finds that NSI did not upload its proposal or otherwise compliantly deliver its proposal to the government in a timely manner and pursuant to the Solicitation's instructions, NSI is not entitled to any relief.  *Johnson Controls*, 125 Fed. Cl. at 292 (2016) ("[I]t remains Plaintiff's responsibility to understand the proposal submission requirements, including educating itself on the use of the electronic filing system specified in the Solicitation."); *Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 701–02 (2016) (the "late-is-late" FAR "provisions ha[ve] been interpreted by both the GAO and our court to impose upon the offeror the obligation of ensuring that any proposal it submits by

electronic means—when allowed or required by the terms of a solicitation—is received before the deadline, taking into account the possibility of reasonably foreseeable circumstances which may delay the delivery of its proposal").

* * * * *

In sum, the Court **GRANTS IN-PART** and **DENIES IN-PART** NSI's revised second motion to supplement the administration record.  The Court further **DENIES** NSI's MJAR and **GRANTS** the government's cross-MJAR.  The Clerk is directed to enter **JUDGMENT** for the government, accordingly.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge